Good afternoon, Your Honors. My name is Brad Levinson, and I represent Appellant Petitioner Zane Floyd. I'd like to reserve seven minutes for rebuttal. The three issues that we wanted to discuss today are, the first one is the ineffective assistance of trial counsel for the failure to present FASD and brain damage. The second will be the procedural default rule under 726 that this Court recently ruled on in Williams that we're going to be arguing something separate, and then we would we might be turning to the random and without apparent motive. Oh, I see. The procedural default is logically prior, no? I'm sorry, Your Honor? Isn't the procedural default logically prior to the ineffective assistance FASD claim? Yes. I mean, we were defaulted, and that's why we're in the case. I know, but you seem to be saying you're first going to argue about the ineffective assistance, and then you're going to argue about the default. I can. If the Court would like to start with 726, I'd be happy to. Makes more sense to me. Okay. Very good. So those are the three. Now I'm going to say the opposite. Ultimately, why does it matter? If you're right about that under Nevada law there was not an adequately established default, you still get to the — where do you get? You get to the merits of the ineffective assistance claim. Correct. That's where you get anyway, whether you do it under Martinez or whether you do it — I mean, anyway, you're going to get to the merits of the ineffective assistance claim. Is that right? Yes, that's correct. So should we just forget about the procedural default since you're getting there? Ultimately, you essentially have to get to the merits of the ineffective assistance either under Martinez or here. I would very much like to argue after the ineffective assistance, I would like to turn to 726 because I believe there is a part of 726 that was not addressed by this Court in Williams. But I think the most important argument right now is a discussion of why this case should be remanded to the district court for an evidentiary hearing on FASD and organic brain damage. Okay. Thank you. So, Your Honors, at trial, counsel promised the jurors that they would hear answers to the question why they should spare Mr. Floyd's life. But counsel failed to present two of the most important pieces of evidence, and that's one, that their client suffered from organic brain damage, and two, that he had a birth defect called fetal alcohol spectrum disorder. And this happened because despite red flags and expert reports, counsel either failed to investigate or failed to follow the leads. And that's what leads us here today. I'd like to start with organic brain damage. Counsel had in their possession in 1989 a report from a Dr. Cartle who had seen Mr. Floyd when he was 13 years old. And Dr. Cartle, who was a psychologist, found the following things in her report. That Mr. Floyd had significant deficits in terms of functional abilities, he had delayed visual motor skills, he had frontal lobe dysfunction, attentional and or processing difficulties, perceptual difficulties, and a significant disparity between his high verbal skills and his low performance skills, which is a sign of brain damage. So counsel had this report in his possession before the trial. Counsel had your client examined, though, and the people who did examine him didn't think that, didn't come up with this diagnosis, right? That is only partially correct, Your Honor. So one of their experts, a Dr. Paul, yes, a Dr. Paul who was a psychologist, did mention in his report prior to the hiring of a neuropsychologist, and I think you're talking about Dr. Schmidt. But Dr. Paul did flag for defense counsel that Mr. Floyd had a neurological injury or deficit most likely stemming from birth. So with Dr. Cartle's report and with Dr. Camp's, I'm sorry, Dr. Paul's report, counsel two months before trial, very late, two months before trial, they hired a neuropsychologist, Dr. Schmidt. And Dr. Schmidt performed testing, and the results that he gave to counsel were, your client is not brain damaged. However, if that was the case and everyone moved on, I wouldn't be arguing this. But that's not what happened in this situation. Trial counsel was skeptical of Dr. Schmidt's report, and he turned to another neuropsychologist and asked that neuropsychologist to figure out the difference between Dr. Cartle's report and what Dr. Camp was saying, I'm sorry, Dr. Paul was saying, and what Dr. Schmidt was saying. And Dr. Kinsora said, yes, I agree with Dr. Cartle. I thought Dr. Kinsora said something more equivocal, like maybe further testing would show something related to birth. So what Dr. Kinsora said is, I agree with Dr. Cartle that there are subtle signs of brain damage. So that's on the table. I think what you're referring to, Your Honor, is he said, I'm not sure if further testing would uncover any more, but we have brain damage. There's no question your client has brain damage. Actually, his report — Well, didn't Dr. Cartle say that? I mean, it was something like subtle indications of some neurological problem or something like that. Subtle frontal lobe dysfunction is, I think, the exact quote from her report. But it wasn't just that, Your Honor. Again, we had the disparity — Does anybody who has frontal lobe dysfunction have brain damage? I'm sorry. I didn't hear the question. Does anybody who has frontal lobe dysfunction have brain damage, at least in the sense that people think of brain damage, which is something that affirmatively damaged the brain? You could have mild, moderate, or severe brain damage. But brain damage is brain damage. So if you have neurological insults to your brain, you have brain damage. It depends. But at least in my experience, there are a lot of kids running around with something that is called frontal lobe dysfunction. Is that brain damage? It is. It just depends how it plays out. In the case of Mr. Floyd, we now know that the organic brain damage that he suffers from stems from fetal alcohol spectrum disorder, which is a birth defect. So what we know now from the expert on FASD is that all the signs and symptoms that Mr. Floyd showed throughout his life — his difficult childhood, his learning disabilities, his intolerance to alcohol, his behavioral problems — all tie into the fetal alcohol spectrum disorder, which is caused by his organic brain damage. Now, whether Dr. Cardle said it was subtle and Dr. Consora agreed with that, we now know through further testing, post-conviction testing, that we actually do have brain damage. Is it the most gross brain damage that this court has seen or I have seen? No. But there is brain damage that explains Mr. Floyd's behavior throughout his entire life. And that's why this evidence is so important. And counsel had red flags to look at fetal alcohol spectrum disorder. For example, they knew that the mother drank. Their mitigation specialist told them to look at fetal alcohol spectrum disorder. Counsel even has written a note in their — has a note in that what we received from them actually stating — I think it says fetal alcohol spectrum or FAS, Dr. Levin. So at some point, they were going to hire a Dr. Levin to look at fetal alcohols. But they didn't do that. So recently, or actually on Monday, we sent to this court a 28-J letter discussing the Williams case out of South Carolina, the Fourth Circuit. And I believe that case is so similar to this case. You had five experts brought on board by experienced counsel. You had a neurologist. You had a neuropsychologist, a psychologist. You had a social historian and one other doctor. And in that case, too, they said there was brain damage. And what counsel did in that case was they said, well, we're not going to present it. They didn't present FAS. And what the Fourth Circuit said is, this evidence is so important because it gives cause and effect to everything in that defendant's life. That's exactly what has happened in Mr. Floyd's case. So the Fifth Circuit in Trevino also looked at this issue and found it very significant that FAS would not interfere with the ability to tell right from wrong. Do you agree that it wouldn't interfere with the ability to tell right from wrong? I think that is something that needs to be fleshed out in an evidentiary hearing because I don't know that that's something that an expert is going to have to opine on. But I also don't think when you're talking about mitigation, whether the point is whether you know right from wrong, I think it's all the insults that have happened to you over the years that lead you to this final point. Keep in mind that Mr. Floyd had no prior convictions. He had four years in the military. He was leading a fairly comfortable life. When he got out of the military, things started to go sideways. So there's not a lot. Granted, this is a very violent crime. And it certainly was a crime that made the news in Las Vegas for quite a while. And with more aggravators than the Fourth Circuit had. It did. And one of the aggravators, so we're calling into question certainly some of those aggravators. But again, this is the type of evidence that, again, I'm not sure how many ways to say this. I think it's so important. It gives cause and effect to everything. What was presented at trial was ADD. And ADD, let's face it, 80% of the kids in America have ADD or are racing around with that. That is not what the jurors were promised an opening argument. Counsel promised an opening argument. I'm going to give you answers to your question. This is a penalty case. We are conceding what Mr. Floyd did. And what he gave them was ADD, which was eviscerated by Dr. Mortallaro, who told the jurors that everything that Dr. Doherty said was false. I'd like to speak a little bit about Dr. Doherty. That is the defense expert that counsel did hire after Dr. Consora. So Dr. Consora has told them, your client has brain damage. At least I agree with Dr. Cardle. Maybe further testing, maybe not. But counsel doesn't do anything with Dr. Consora because Dr. Consora has told them. Can I just go back for a minute? Yes, ma'am. The current expert in this case is the same as the current expert in the Fourth Circuit case. Dr. Natalie Brown, that's correct, Your Honor. Okay, go ahead. Dr. Doherty had a doctorate in education. He was not qualified to opine about brain damage. And the couple of tests that were run that Dr. Doherty reviewed were tests that were run by the defense expert. The defense expert actually sat down with our client and administered psychological testing. That's highly unorthodox. And that's what Dr. Doherty based his entire opinion on, that our client wasn't brain damaged. What's unorthodox? To have a defense investigator, a layperson, administer testing. So it is our opinion that evidence of Mr. Floyd's FASD and organic brain damage would have permitted counsel to construct a much more persuasive narrative, and given the jurors a reason to support something other than death, and certainly something stronger than ADD, which, again, was another reason ADD was not powerful, was there was testimony that Mr. Floyd could have grown out of ADD. His frontal lobes could have matured, and he was no longer brain damaged. So the jurors had very little to connect any of the pieces of evidence that they were given. Again, the learning disabilities, behavioral issues, social skills. The jury was told that the mother drank during pregnancy, though, right? They were. And that's a piece of evidence that just floats on the water. But weren't they also told that it could have or did have a developmental effect? They knew all of these facts. But there was some assertion of a connection between the two. Between? Her drinking and the developmental effect. That's right, but there was no context, absolutely no context, without an explanation that the mother's drinking leads to organic brain damage, which affects the entire life. I mean, the problem is that at some point it becomes a naming problem. I mean, if they were told that she was drinking and that because she was drinking the child had developmental effects. I mean, it doesn't take a lot to fill in the fact that it must have been something in his brain that did that. So there was evidence of a brain impact from the fetal alcohol. It wasn't called fetal alcohol syndrome. I think it's more than a naming mechanism. I think it's an understanding of the jurist. I have one related question. Does it make any difference that the trial in Williams was much later in terms of the awareness of fetal alcohol? It was, what, 15 years later, more than that? More than 20 years later. The answer to that is no. Fetal alcohol spectrum disorder has been around for a very long time. As Dr. Brown states in her declaration, in 2000 it was well known and being litigated throughout courts. But the professional standards for lawyers had changed by the time Williams was tried, hadn't they? I mean, the professional standards that would have applied and that we measure IAC against by the time Williams was tried talked about looking for brain birth defects and things much more specific to this issue, didn't they? You're correct that the comment in the 2003 ABA guideline was not there about FAS. I don't think the 1980 guidelines are still pretty strict on what counsel needs to do. I would, I guess, ask this Court to look at Rampea v. Beard, which I actually don't know when the trial was, but it was certainly probably before Mr. Floyd's trial in 2000, and it talks about FAS. That was one of the issues that wasn't looked at. But the prenatal and birth trauma guideline just wasn't there, so that seems like a significant difference based on when the two cases were tried. There were guidelines. Actually, I think I have the dates when these guidelines were established for FAS. I'm sorry, Your Honor. I do know in 2000 there were guidelines for scientists and doctors to follow when looking at FAS. I'm sorry, I don't have that right in front of me. But I do believe there were guidelines, and I certainly would give additional briefing if the Court requested it. But this is the type of evidence that we would like to present in the district court. No court, state court or federal court, has had the opportunity to look at this evidence. The district court denied it out of hand by saying Dr. Brown hadn't interviewed the client, and that was a reason not to have the evidentiary hearing. But Dr. Brown didn't need to see Mr. Floyd because the four characteristics of FAS were present in documentation. And there is no rule saying that you have to have that highest standard of proof. You don't have to prove you're winning an evidentiary hearing to have an evidentiary hearing. In our view, a small ask, Your Honor, is to have this case remanded to the district court for an evidentiary hearing. Because the state's ask is that you deny his appeal and we proceed to an execution. And I think balancing this out, some court should hear the evidence of Mr. Floyd's FAS and brain damage. If the Court doesn't have any more questions or further questions on that, I will turn to 726. Okay. So we've arrived at 726. It is not the argument, we're not making the argument from Williams. What? I'm sorry? We're not making the argument that was decided by this Court in Williams. So we're not talking about Section 1, which is a strict one-year statute of limitations. What we're talking about is Section A, which is what we call the Crump exception. I understand that, but I'll go back to what I said before. All right. Suppose you're right. Right meaning, as I understand it, that the — when you had to file this Crump — Crump, as it was called? Yes. Petition. After the — the time runs from the remittiture in the direct appeal, but there's an exception, cause and prejudice exception, and the case law developing this Crump petition, and that allows you to file — that you can't file that until the first PCR is over. And the question is, from whence, given when the first PCR is over, do you have to file this Crump petition? And there was no actual law about that at the time this happened. That's basically your argument. That is the argument. All right. So what? All right. Fine. Let's say you're all right. Therefore, there was no procedural default. Aren't we just back to the same trial counsel IAC claim you've already just argued? No, Your Honor. It's more than that, because in — it's more than just the IAC claims. It opens all the claims back up. It was more than just the Martinez claims. All the claims that we brought forward under the guise of Martinez could have been heard as direct appeal, as IAC. Yes, but all the claims that you brought under the guise of Martinez were trial IATC claims. That's all you could bring, and that's what you brought. No. And so why — how does it advance the ball at all? I mean, in fact, on your argument, which I'm not sure applies, the Martinez standard is more forgiving. So how does it help you? I think because it's more than just IAC claims. All the claims that were dismissed, they were in Mr. Feigl. But if they're not IAC claims — oh, I see. It's because it doesn't overlap Martinez necessarily, then, you would say, because the State ineffectiveness of PCR counsel is not limited to ineffective assistance claims? Is that why?  That's correct. So therefore, there are some claims that wouldn't get through Martinez. Yes, that's exactly right. But it wouldn't affect the claim you just argued. Not the one. Anyway. That's right. Not the ones we just argued. Wouldn't those be defaulted for other reasons? I mean, if they're claims that aren't IAC claims, wouldn't they have to be raised on direct appeal? In a Crump petition, you can raise anything. It's not — You could try, but wouldn't anything that could have been raised on direct appeal be defaulted for that reason? It could be, but these — again, these are other — Like, what is an example of a non-IAC claim that you have here that wouldn't be defaulted for not being raised on direct appeal? I don't think that — so I think in Nevada, the — I think you're looking at 34, 8, 10. And I don't think that that is consistently and regularly applied. So if we came to court with those issues, this Court would be able to hear them. We're only looking at the 726 issues, those raised in the post-conviction. The second post-conviction petition. And those claims could be anything from trial court error with respect to the jury issues, premeditation instruction. There were ten more claims that were defaulted that we could have raised that this Court or the Federal court could have heard. So I think it is more than just IAC claims. And that's my second question. If, in fact, this claim wasn't State law defaulted because of the — there was no existing rule about the timeliness, does that eliminate the need to demonstrate that the initial — all these — I hate all these acronyms, but the initial PCR lawyer ineffectiveness, or does it just let you do it? Because what it is that you would get to do if you filed it timely would be to prove the ineffectiveness under State law of the State PCR lawyer. Do you get to not do that because you filed late? If we file late, every claim that PC counsel should have raised is defaulted. So that's any claim, including a direct appeal claim. It's any claim. Right. But if you didn't file late, if you filed timely, all you get to do under State law is prove the ineffectiveness of — is to prove cause and prejudice under State law, meaning you have to prove the ineffectiveness of the initial PCR lawyer. You're now saying that if you — because they didn't have a consistent time period, you don't have to do that anymore. No. We're not saying that. We're just saying that there was absolutely no notice given to Mr. Floyd of when he needed to file. Okay. Fine. Let's assume that it's now a timely crumped petition. You still — doesn't that mean you have to prove the ineffectiveness of State — of the State PCR lawyer? To get over cause and prejudice, to have your claims heard before the court. That's what I'm asking you. Yes. To get your claims heard before the court, you still have to show cause and prejudice. This court. The district court and then this court, yes. Even though that's a State — I find it very confusing, because it's a State court rule that's leading to your having to do that, but it seems like a freebie if you don't have to still do it, when the whole premise of the petition is that you're going to do it. I may not be understanding that. Now, I think — I mean, I know what your answer is. You know, and it seems that you're probably right, although there's kind of a mismatch. So now it isn't true that we get directly to the — all these issues. You first have to prove that the initial PCR lawyer was ineffective, as you're now telling me. In Federal court, if the claims were not barred under 726 in district court, then the district court would have had the opportunity to hear the merits of claims once we got around the cause and prejudice. Without regard to the effectiveness of the State PCR lawyer. Once we got around that. Once we got around that. Oh, I'm sorry. Yes, yes. We would be able to. They would be exhausted claims and they would be properly before this Court. Without regard to the ineffectiveness of the State. That's correct. All right. But you said the opposite before. I apologize, Your Honor. And I — so like taking the voir dire issues, for example, I had understood you to be embedding those at this point in an IAC claim. That's correct. But they would not be embedded in an IAC claim. Those claims had not been defaulted under 726. Then you would be looking at the merits of those claims, just not ineffective as this is a trial counsel for failure to doing something in voir dire. I understand that the ineffectiveness of a trial counsel backs that, but I don't understand why the — or I don't necessarily know whether the ineffectiveness of the PCR lawyer backs that. You said you wanted to reserve 7 minutes, do you? Yes.  Thank you. Thank you very much. Thank you. May it please the Court, Counsel, good afternoon, Your Honors. I think I'll jump straight to the procedural default issue. Do you want to state your appearance? Sorry, Jeffrey Conner on behalf of the Respondents. I apologize. I'll jump straight to the procedural default issue because I think there's an easy way to explain this that gets to what Your Honor's talking about. Really, how the State courts apply the exception to the time bar here only really matters if this Court is going to entertain Respondents' argument that under Edwards v. Carpenter, a procedurally defaulted claim of ineffective assistance of counsel cannot serve as cause for procedural default. Right? So what they're talking about here is that the claim — the underlying claims are found to be untimely. They're barred by 34-726. Then you look at the procedural default or the good cause exception, and what happens there is that the Damascus Supreme Court comes back and says your claim for a cause is itself procedurally barred. But why should we care? So I understand when the State supreme court says that. It's the State supreme court deciding why it won't say there's cause and prejudice. But how do we need to look at what they say about their own cause and prejudice analysis? Don't we do our own cause and prejudice analysis under Martinez? You would if you're not going to apply Edwards v. Carpenter. Edwards v. Carpenter, the United States supreme court, said that a claim of ineffective assistance of counsel that's presented as cause for procedural default must not be itself procedurally defaulted. If the State court procedurally defaulted that claim — But we have explicitly not applied that rule to Martinez. Right. So absent the Court applying that rule in the Martinez context, this discussion about application of the exception is meaningless, because we're talking about the State statutory right to counsel and the fact that under Crump in Nevada, a ineffective assistance of post-conviction counsel claim can be presented as cause for procedural default. The timeliness of that claim, unless this Court is going to apply Nevada — Well, you sure spent a lot of time in your brief trying to prove that it was an untimely claim, and now you're telling us it doesn't make a difference. No, Your Honor. I think it does make a difference in terms of the timeliness with respect to the application of the time bar itself, the one year from the issuance of remitted or on direct appeal. Any claim raised after — But obviously you could not bring — as I understand it, under Nevada law, I mean, are they — you didn't acknowledge this in your brief, but it seems to me that they adequate or clearly established or whatever rule about when you needed to bring the second successive Crump petition. I disagree, Your Honor. I think they — in their briefing, they cite the case of Hathaway v. State, and I disagree with their description of the time frame in that case. And what happened in Hathaway was dealing with — Well, whatever it is, in 2016 in the Repo case, the Court seemed to say we're deciding for the first time what this time period is. They're putting a one-year time frame on it. Before that, Hathaway said that a claim that you didn't previously know about had to be raised within a reasonable time of discovery. Okay. Hathaway was decided in the late — But not a year. The late 90s, I believe. There was no one-year rule. So it wasn't explicitly laid out as a one-year rule. It was within a reasonable time. And what I haven't seen in this case is an argument that based on the way that the Nevada Supreme Court was applying Hathaway, that — But I thought in this case they said it's a year, which is no good because you didn't do it in a year. They did. And that wasn't the rule at the time. Or if it was the rule at the time, they made it up for this case. I agree, Your Honor. All right. So there wasn't an adequate rule. But what I'm saying is that what I haven't seen is an argument that Hathaway itself was being — was not — they didn't have notice that that was being applied in a way that a period of exceeding one year would be unreasonable. Now, we're — in my view, we're talking a lot about nothing, because unless this Court's going to apply Edwards, it doesn't matter, right? Because you're going to get to the Martinez stuff. Let me ask you this, counsel, because I agree with Judge Barzano and Judge Friedland that this whole area of the law, from my vantage point, is very, very confusing. If we were to apply a de novo review of a Strickland claim in this case, and let's say that — let's say we start there. We say, look, we're just going to apply Strickland de novo. And let's say we agree with you that there's either no cause or no prejudice. As far as you're concerned, can we simplify the analysis that way? Obviously, you'd want it to go your way. But if we — if we find under that standard there's no cause and prejudice, you agree no matter how we get there, your side prevails? Certainly, Your Honor. I mean, I think that that's — that's a central point to all of this, that if the Court was going to find that it doesn't matter if we looked at the ineffective assistance of counsel claim, say, under — even under the, you know, this Martinez substantiality standard, this is not a substantial claim, that would — you know, you don't have to decide any of the procedural default issues. Well, but — I mean, that's another mystery, because you argue in your brief, I think, that the — essentially, that the substantiality of the standard isn't really the standard, and that seems to be correct, because under — is it — do you know, one of those cases of if you add up all the various opinions — what? Correct. Is — is Dietrich — And — and Clairbourne, you still have to do a whole — Mark's analysis? Well, the Mark's analysis — leaving aside the Mark's analysis, assuming it appears what you have to do is still do a whole Strickland analysis. If you do a whole Strickland analysis, then the substantiality kind of goes out the window. Then you have the second thing where you still have to prove that — that there was actual ineffectiveness and actual prejudice. I mean, I've never understood — at the PCR level, but how could there be actual ineffectiveness at the PCR level if you — if there wasn't a good enough claim? It's so confusing. I'm so confused. I agree, Your Honor. That if there is — yeah. So to start with, I think there's a couple things to address with this, is that one is Judge Tolman's decision in Sexton v. Kozner acknowledges that — Well, that was before the — wasn't it before the en banc opinion? I think so. Yeah. So let's forget that one. Let's start with the en banc opinion. Well, okay. So Your Honor mentioned Claiborne. I don't think Claiborne is cited in the briefing at all, so I was going to try to avoid talking about that case today. But, you know, Judge Clifton's opinion in that case does add up the tally of where the judges fall in all this stuff, and he concluded that there was not a majority of the court that joined Judge Fletcher's portion of the decision establishing that you do not have to show strict congression. And Claiborne is a presidential opinion. So, okay. So there is — you know, you do have to meet the Strickland standard. And then on — this is confusing, but — But then we're back to the same place again, because if you have to meet the Strickland standard at the PCR level, then that's the same thing you would have to do under the State law, so we're all in the same place again. I agree, Your Honor. And so — but one thing I would like to add to that is that when you're looking at a — I think a good way to explain this, at least from my perspective, is this is — it's almost like applying AEDPA double deference to an ineffective assistance of counsel claim, because when you take — you have to look at this from the perspective of post-conviction counsel reviewing trial counsel's performance and give deference to post-conviction counsel's decision-making in deciding what are the right claims to raise here. And, you know, if he looks at a claim and says, look, I can easily identify a strategic reason why counsel might have done this, I'm not going to pursue that claim. That would be totally reasonable performance by post-conviction counsel. Again, the same thing with prejudice. If he's looking at a claim, he says, man, I really think counsel made a big mistake here, but I'm going to have a real difficult time proving prejudice on this, then, you know, post-conviction counsel's not ineffective for failing to raise that claim. And I think that — Judge Tallman kind of gets to that a little bit in Sexton v. Kosner. I mean, he just jumped to the conclusion that the underlying ineffective assistance of trial counsel claim was — didn't have any merit, and so there was no need to review post-conviction counsel's actual performance because — But it was before Dietrich and before Claiborne, so Sexton's kind of irrelevant. Let's just — but do you want to get to the merits of the IACC claim? Well, I don't think it's irrelevant, though, Your Honor, to the extent that you do have to defer to post-conviction counsel's performance. You apply that strickland deference to post-conviction counsel, who's then reviewing trial counsel's performance under that same strickland deferential standard. So I think there's two layers of deference when you're applying this stuff. But getting to the merits, I would absolutely disagree with my colleague's representation of the evidence in this case. I think — I was trying to not make any noise, but digging through the brief. I know there's somewhere in the briefing where they conceded that both Dr. Consora and Dr. Schmidt did not find the existence of brain damage. If we just cited the case here, would we be in conflict with the Fourth Circuit Williams case? I don't believe so, Your Honor, and I think there's a couple reasons why. First is that, you know, the Williams case acknowledges that there wasn't an actual framework for dealing with this stuff prior to 2005. This case has predated that as well as the 2003 guidelines from the ABA. But on top of that, this case is distinguishable in that what I just talked about with the absence of evidence of brain damage, the two neuropsychologists that they Dr. Schmidt, who did a two-day analysis of testing with him, comes back and tells — and there's a memo of this in the EOR memorializing the phone conversation. I believe it's at EOR 1278. Dr. Schmidt says, You're not going to like what I have to say. And he says, I've done everything I can to rule out the possibility that your client's a psychopath. Wasn't it also true in Williams that they had neuropsychologists and so on? There was, Your Honor, but the neuropsychologists in that case identified brain damage. That didn't happen in this case. It seems to me, Counsel, that after reading the Fourth Circuit's case, and I appreciate you bringing it to our attention because I think we need to deal with it in this case, but things that jump out as different to me were the fact that the facts of this case, Floyd, seem not to belittle the facts of Williams, but we had four murders versus the one. And also I think the Williams case made a lot of the fact that the jury indicated it was deadlocked. And I think there's one declaration from one defense investigator saying one juror in our case may have gone the other way, but nothing as definitive as in Williams. Am I remembering that correct? Two things in response to that. First is, yes, Your Honor, you're absolutely right. The facts of this case are significantly different than Williams. What the Fourth Circuit acknowledged in Williams was that there was one minor aggravator. Here we've got four murder convictions. On top of that, two other aggravators that weren't. The Nevada Supreme Court found that the evidence met those aggravators. And so this is a significantly different case than that case when you start looking at talking about weighing the aggravators versus the mitigating evidence. So this case is significantly distinguishable on that ground. And the ABA standards, I think you were starting to get at this, too. The ABA standards had changed, too. So the ABA standards, if I understand it correctly, at the time of Floyd's trial, had requirements for interviewing the defendant about things like birth defects but not about experts specifically, and that had changed by the time of Williams. Is that right? Correct. And so to me that's significant here because what we do have is that when you look at Dr. Schmitt's report, Dr. Schmitt knew that the mother had acknowledged drinking during the first trimester. That's in his report. He knew about it. He did everything he could to rule out the possibility that this guy had antisocial personality disorder, but that's what he came back with. And it's interesting to me that they want to try to say that Dr. Schmitt's testing gave short shrift to all this stuff. He met with Zane Floyd for two full days. This is not just a passing evaluation where he just reached, you know, basically what's going on here is you've got one doctor that the defense hired that reached the conclusion that this guy was a psychopath, and now in post-conviction they've been able to go out and find another expert that just disagrees with him. This isn't a failure to investigate case. So unless there's further questions on that, you know, does the court have additional questions on any of the voir dire issues or the claims on the merits? Well, I would like to know a little bit about ‑‑ I found disturbing. The testimony by Ms. Nall, is that her name? The victim's mother. The victim's mother, yes, which was incredibly far-field. And the question is why shouldn't we worry about it? And the judge kept telling him the prosecutor's stop, and the defense lawyer kept objecting. And nonetheless, it kept going. Your Honor, I think that to address that, I think that, you know, that's a claim on the merits that was decided by the Nevada Supreme Court. I'm sorry, what? That was decided by the Nevada Supreme Court on the merits. Of course, we apply it, the AEDPA standard there. The Nevada Supreme Court looked at that and agreed that, you know, that some of the testimony went beyond the scope of what would normally be permissible for victim impact testimony but found that it did not render the entire proceeding fundamentally unfair. That is the governing standard under U.S. Supreme Court precedent. And so the district court addressed that. In fact, I mean, the entire set of evidence, it seemed to me, went well beyond what was recognized in Payne as appropriate. I mean, her son had had a very unfortunate life, and she went on about it for pages and pages. And the impetus was to say we're going to, you know, Brett, this is such a sad story that we have to do something for you, essentially. I disagree that that's necessarily improper under Payne. I mean, I think what the Supreme Court has talked, U.S. Supreme Court has talked about in these cases is recognizing, okay, of course, the Eighth Amendment requires that there's an individualized sentencing determination. One would think that a victim impact statement was, you know, this guy was, you know, the victim was promoting, was supporting his family and he's not going to be able to see his children and so on and so on. But this whole long story about this, you know, completely sad and non, you know, atypical life of the child, what, what, how was that a victim impact statement? Or, I mean, it just meant that the mother was, you know, had had all kinds of problems relating to her child. Certainly. I think that that goes to the impact on the family, Your Honor. And that's exactly what Payne talks, and those cases talk about, is that you, the defendant gets a right to present himself as an individual to the jury. But victims also get to do the same thing. But now I think you're making an argument beyond what the state court even said. The state court said this was an error, as I read it, but it just wasn't prejudicial, right? No, I think what the state court said was error, was the discussion of things that had happened to other family members during this kidnapping, that that was the stuff that should not have been discussed, stuff that wasn't specific to the victim. And that's what the Nevada Supreme Court said. I see. Okay. Well, in general, though, this testimony was too much and irrelevant, right? So the state court said this shouldn't have happened. Right. Well, and it may have gotten into, you know, kind of like the state corollary to 403 of whether this is more probative than prejudicial kind of thing. But, again, the standard for looking at something like that is whether or not it rendered the entire proceeding fundamentally unfair. That's the standard that the Nevada Supreme Court applied. And I think the district court correctly found that. Well, how does it fit? How does it — what is the ultimate Nevada standard for the death penalty, right? You have aggravating factors. You have mitigating factors. You weigh them. And then where does this stuff fit in? So the way that Nevada works is as long as the mitigators do not outweigh the aggravators. If it's 50-50, that's enough. And then the jury can consider other matter evidence. What other matter? Anything that's relevant to sentencing. And when the victim's — for example, when the victim's mom testifies about the loss of her son and her son's life, let's assume — put the daughter aside, son's life. That is fair game for the jury to consider as long as the aggravators and mitigators are at least 50-50. In terms of, yeah, whether or not they're going to impose a death sentence or not. Correct. And how does that comport with the narrowing rules of the Eighth Amendment, which I don't understand? I mean, it's enough that you have the aggravators and the mitigators and then anything goes? Well, so that's what narrowing is about. Okay, if you — this is what — I think we're getting far afield of the briefing here. Well, I thought that they were arguing this. I thought they were arguing this, actually. If you go look at — well, I don't know if they're making an Eighth Amendment narrowing argument. I understood that they were, but go ahead. But if that's where the Court's looking, you know, as long as you have a narrowly defined aggravator, that's enough. That satisfies the Eighth Amendment. And then you can just say to the jury, and now just — The sentence to the jury makes a moral determination about the weighing. And, I mean, that's — this, I think, maybe gets a little bit closer to their argument about jury instructions and whether or not the — you know, you have to — the weighing has to be beyond a reasonable doubt. No court's ever said that, including the U.S. Supreme Court and Hearst. But Hearst, as — you know, they, in the reply brief, talk about us not discussing Hearst is irrelevant. You're right. Because Hearst is many, many, many years after this — But anything doesn't say that. So the Eighth Amendment concerns about narrowing are satisfied if there is an adequately narrow aggravator. That's all that's required. If the State proves an adequately narrow aggravating circumstance beyond a reasonable doubt, that's enough to satisfy the Eighth Amendment. There's a couple things, too, that I forgot to mention with the ineffective assistance of counsel claim on the FASD stuff. They repeatedly argue in their briefing that you can't have simultaneously or comorbid, if you will, diagnoses for antisocial personality disorder and FASD. That's wrong. If you look at the pages of the DSM that they're looking at, what the DSM says is that you should not diagnose antisocial personality disorder when the characteristics that define that diagnosis are present only during a time when you are psychotic, schizophrenic, have some other mental disorder going on. If you read Dr. Brown's report, she acknowledges this point. She says FAS type 3 cannot rule out the possibility of a personality disorder. So the suggestion that those two things can't coexist is wrong. And finally, there's this huge long list of prosecutorial, assertive prosecutorial misconduct, of which I probably found the most disturbing one that I don't even think you discussed in your brief, and that's the Caldwell question, where you were, they were told, the jury was told, essentially this is all a collective process and there's going to be a more process after you're done and so on. Isn't that exactly what Caldwell said you weren't supposed to be doing and could be prejudicial because it can get the jury off the hook in its own mind as to its responsibility? It does, Your Honor. Caldwell does say that. I think here in this case with the overwhelming nature of the aggravating evidence that it was reasonable for the State court to determine that it did not render the entire proceeding fundamentally unfair. So everything comes back to the fact that this was such a bad crime, that 75 episodes of prosecutorial misconduct. What if we looked at it all together, all the episodes of prosecutorial misconduct and this evidence that shouldn't have come in? And what else? There's a lot going on. There's a lot. I think the district court does a good job of parsing out what crosses the line and what doesn't, and a lot of that is taken in context with argument from the defense as well as jury instructions from the court mitigate a lot of any of the problems with any of the improper argument. And truly, I believe that the prosecutor could have not made a closing argument at all and the jury still would have reached the same result in his case. That always leads me to wonder why he did and why he went overboard. It's so, you know, I'm sure you've heard this many times before, but, you know, when you stand up at an appeal and you say, you know, this was all harmless, it makes you wonder why, you know, if they didn't think it mattered, if they didn't think they had a problem, if they didn't think they really had to convince the jury, they wouldn't have stepped over the line as many times as they did. And it's always been a mystery to me. I can't get inside the prosecutor's brain on this one, so I don't know, Your Honor. But I do think at the end of the day, the evidence in this case is so overwhelming. When you look at cases like Darden versus Wainwright where the Supreme Court acknowledged that every court that reviewed that case appropriately determined that what the prosecutor said in that case crossed the line, but it didn't impact the fundamental fairness of the proceeding, that's what was reasonable for the Nevada Supreme Court to reach that conclusion here too, especially when looking at a case like Darden versus Wainwright. I was wondering if you could tell us what the status of the Alvagen litigation is and whether there's actually an execution protocol in Nevada. So right now, actually this morning, the Nevada Supreme Court issued an order to show cause as to why the Alvagen preliminary injunction should not be vacated because Mr. Dozier is now deceased, and so there's a potential of mootness, ripeness issue with what's going on with the Alvagen litigation. So if that happens, then the protocol will come back? Well, I mean, there's not an issue with the protocol right now because there's nobody set for execution in Nevada right now. The Alvagen litigation, of course, was all with having to, at least according to Alvagen, it's a business dispute over whether or not they should be able to get their drugs back or not. But there was an injunction that would have prevented the drugs from being used and the drugs were part of the protocol? There was an injunction that was vacated. It got set for execution again, and then the private business suit was filed, and there was an injunction against the use of their drugs. But doesn't the protocol depend on their drugs? That's what I'm trying to ask. I mean, not necessarily their drugs, but that's part of Alvagen's argument is that we could try to get the same drug from another source, but at this point it seems like the Nevada Supreme Court is ready to put an end to all that litigation. But what does that mean? That's what Judge Friedland is asking. Does that mean now we're back to the former protocol or we're back to no protocol? Well, I don't represent the department. I haven't worked closely with the Department of Corrections on this, so I don't know what the status of any protocols are or anything like that is. What I do know is that there's nobody set for execution at this time in Nevada, and so there's — But is the net result, and I've been there, I don't think Judge Friedland has, that a month before we're going to end up with a writ of execution for a month from now and a protocol put in at that point and mad and crazy litigation at that point because no one's going to tell us before that what the protocol is? Is that where we're going to end up? So, well, I think the Nevada courts have shown that they're ready to look at this stuff seriously. That if somebody does get set for execution, that they're going to take a close look at this stuff. How long in advance of an execution are the writs of execution issued? I think it's 30 days. Yeah, so my example is exactly right, i.e. within 30 days. Or maybe two weeks, it sounds like. But so the thing is is that, one, right now that's a claim that's not even really before this court. What's raised in the petition and what the district court procedurally defaulted was a facial challenge to lethal injection. But to a particular protocol. A challenge to a particular protocol is completely unexhausted. They haven't challenged this protocol. If they're going to bring it in a 2254 action, they've got to exhaust in state court first. The argument that there's no remedy available in Nevada state courts is wrong. The Nevada Supreme Court, just in the Dozier case, said, look, we won't review this in a 34 petition, which is the habeas statute. We want you to bring this through a complaint so we can have an actual trial where we can call experts, proceed under the rules of civil procedure and do this properly. Yes, if there's an actual protocol. But if the State Corrections Department is going to withhold knowledge of what it is it's going to do until there's a pending execution, we're going to end up where I described, where we've ended up before in Arizona particularly. They kept pulling the protocols. And again, Your Honor, that to me just plays right into the ripeness question here about the statute. I'm not disagreeing that there's nothing for us to decide now. I am suggesting that it might be nice to go back and see whether you can get some order to this so that we're not all litigating with a gun to our heads in a death penalty case when the whole thing, when it does become relevant, if it ever becomes relevant. Okay. Thank you. If the Court has no further questions, I'll submit and ask that the Court affirm the judgment from below. Thank you. A couple of quick points. I'd like to undo my confusion to the Court about Crump, and I apologize for that. So under Crump you do have to prove that state post-conviction counsel was ineffective. But once you overcome that, then you can litigate any claim in state court. And so once that claim is litigated in state court, then we can bring that claim to Federal court. Now, we couldn't do that under Martinez. For example, Davila says you can't bring an IAC of direct appeal counsel claim. We could have brought that up if we weren't barred by 726. And in the recent Rippo v. Baker ---- Okay. But I still don't understand then. In order, if I accept everything else you're saying, do you have to prove to us that there was state ---- No. Not if we get through 726 down in state court. What we're going to bring to you is a merits claim. Well, how are you going to get through 726 in state court? They've already thrown you out. The only question now is whether the procedural default that they applied to you is an adequate one. Right. And we're saying it wasn't. All right. So if it wasn't, then what? Then you ---- And you're going to go back to state court? They're not going to let you back in state court. They say it is adequate. No. Then you can entertain our claims. Those claims that were thrown out, those claims that are not IAC claims, this Court will look at. Well, the state PCR. Yes. Yes. Then they're just straight merits claims, I believe. All right. So which ones do you want us to entertain that are not the IATC claims? I mean, getting back to the ---- I was trying to reframe it. If we were to apply a straight Strickland analysis to this case, no EDPA, just straight Strickland, and we find the government prevails in this case under that standard, that the government would prevail, what is left of your case? If we find that trial counsel, no matter what trial counsel did in this case, even if he called the world's greatest fetal alcohol syndrome, it wouldn't have changed anything on the prejudice prong. What's left? I know Judge Berzon doesn't like claim numbers, but I have ---- She's not alone. Okay. So I won't read a claim number. I'll read you the claims. We have 10 claims that were barred by 726 that were not addressed by the Federal Court. Trial court error in setting arbitrary time limits during voir dire, so it's part of our voir dire. It's not under IATC. It's a straight voir dire question. And that was raised in the second ---- in the successive ---- Yes, Your Honor. So essentially you're ---- I mean, the short answer to Judge Owens is the set of claims we're now talking about which were not State ineffective trial counsel claims. Correct. There are at least 10 of them. And they involve a lot of the prosecutorial ---- Prosecutorial misconduct, voir dire, jury instructions that are not under Martina's label. They're straight merits determinations. They would be straight merits determinations by this Court. Because they were procedurally defaulted, so they're not EDPA is what you're saying. Correct. Okay. I thought the prose misconduct ---- Some of the prosecutorial misconduct was and some was under IAC. Okay. Returning to the Mona Nall testimony ---- And some were not defaulted. Some of them were just ---- a lot of them were decided. Some were decided at the ---- And the Nall testimony was decided. That's correct. That was decided. So then we would have to apply EDPA. You would. You would have to apply EDPA. I would like to say one thing about ---- I'm sorry. Can you ---- I just want to make sure I understand what you're saying. So these 10 claims that are not IAC claims, you're just saying we should resolve those on the merits. Yes. If you find that 726, subdivision A, is not consistently applied or regularly applied, then you could review those claims on the merits, or you could remand them to the district court as you're remanding to the district court for the evidentiary hearing that we're requesting on the organic brain damage and FASD. Everything can go back to the court. But to be a little more nuanced, only some of them, because some of them would be under EDPA. Anything ---- That's correct. That's correct. But the court didn't look at some of them at all. Looking at the Mona Nall testimony, the Nevada Supreme Court made a statement that it was clear that the district court found the Mona Nall testimony irrelevant. And somehow the jurors would have picked up on that, and they would not have listened to the evidence. I think that is just an erroneous application of any law. It doesn't matter if the trial court found the evidence erroneous. It's what the jurors thought about that evidence. So I think, Your Honor, you said there might have been 35 errors. It's really hard to tell how many errors there were for prosecutorial misconduct, but they were rampant in guilt and punishment. And I think it would behoove everyone ---- Well, some of the ones you claimed, to be frank, seem silly to me. And, I mean, either they're not errors or they're trivial errors. I mean, like, you know, I think such something or things like that. I mean, there were a few that seemed egregious, but mostly they were kind of silly. I think whether that's ---- I wouldn't concede that, but even if that's accurate, these errors were fairly egregious. And even the State district court ---- I'm sorry, the Nevada Supreme Court and the Federal court all acknowledged that they were egregious. And I think you would have to do ---- Some of them are. A few of them. Some of them. Well, more than ---- more than a few. I think the Nevada Supreme Court found five in total over the State post-conviction and the direct appeal. And then the Federal district court found at least 11. That's a lot of errors that run rampant through guilt and punishment. I see the out-of-time. Okay. Thank you very much. Thank you both for a really very useful argument in a really complicated case. I thank both of you very much. Thank you. Keeping the moving pieces around is very hard. The case of Floyd v. Filson is submitted and we are adjourned. Thank you.
judges: Berzon, Owens, Friedland